```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

GRAYBAR ELECTRIC COMPANY, INC.,   )
                                  )
              Plaintiff,          )
                                  )
        v.                        )      No. 4:06 CV 1275 DDN
                                  )
FEDERAL INSURANCE COMPANY,        )
                                  )
              Defendant.          )

**MEMORANDUM AND ORDER**

This matter is before the court on the motion of defendant Federal Insurance Company for summary judgment (Doc. 24), and the motion of plaintiff Graybar Electric Company, Inc. for partial summary judgment (Doc. 27). The parties have consented to the authority of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). A hearing was held on April 17, 2007.

## **I. Pleadings**

Plaintiff Graybar Electric Company, Inc., brought this action against defendant Federal Insurance Company, alleging that defendant breached an insurance contract, Policy No. 8147-74-19, by refusing to pay the entirety of Graybar's losses in certain underlying litigations. Count I seeks a declaratory judgment of coverage under the Crime Coverage section of the policy, and Count II is for breach of contract.

Defendant moved for summary judgment. It argues that Graybar did not suffer a "direct loss" under the policies.[1] Federal argues that the Crime Coverage under the policy is limited to "direct losses" to the insured due to "theft or forgery" by the employee, not indirect losses based on vicarious liability for losses suffered by third-parties. Federal also disputes whether the subject documentary signature, described below, was in fact forged and whether Graybar suffered any loss, directly caused or proximately caused, by the subject signature.

Plaintiff also moved for summary judgment, and argues that the court must apply a proximate cause analysis to determine whether it

---

[1]The parties agree that the issue of "direct loss" is the only issue before the court for summary judgment. (Doc. 25 at 2.)

sustained a "direct loss," and, under this analysis, its losses are covered under the policy.

## II.  Summary Judgment Standard

Summary judgment must be granted, when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Union Elec. Co. v. Southwestern Bell Tel. L.P., 378 F.3d 781, 785 (8th Cir. 2004).  The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences.  Union Elec. Co., 378 F.3d at 785.  A fact is 'material' if it might affect the outcome of the case, and a factual dispute is 'genuine' if substantial evidence exists so that a reasonable jury could return a verdict in favor of the non-moving party.  Die-Cutting Diversified, Inc. v. United National Ins. Co., 353 F. Supp. 2d 1053, 1055 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial.  Celotex, 477 U.S. at 323.  Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence of specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir.), cert. denied, 543 U.S. 956 (2004); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).

## III.  Undisputed Facts

A complete review of the record, including the joint stipulation of facts filed by the parties, reveals the following undisputed facts.

Federal Insurance Company issued to Graybar Electric Company, a New York Corporation with its principal place of business in Missouri, an Executive Protection Policy, Policy No. 8147-74-19, effective October 1, 1997 through October 1, 1999, extended by endorsement until October 1, 2003.  The policy provides, in relevant part:

> The Company shall be liable for direct losses of **Money, Securities**, or other property caused by **Theft** or forgery by

> any **Employee** of any **Insured** acting alone or in collusion with others.

(Doc. 26 at 1; Doc. 1 Ex. A, Part 2 at 12.)

Office Innovations is a distrubutor of office supplies and similar products, and it does some of its business on the internet. Graybar is a wholesale distributor of electrical and telecommunication products. In May 1999, John Gadd, a representative of Office Innovations, visited the Norcross, Georgia office of Graybar unannounced, and asked to speak with someone about selling Graybar's telephone equipment. He was introduced to Tim Horner, an employee of Graybar. Horner expressed interest, and, after giving Gadd some catalogs, told Gadd that he would have Tim Daniels contact Office Innovations. (Doc. 26 at 1-2.)

Thereafter, Tim Daniels contacted Office Innovations, and, after a meeting at Office Innovations's office, Daniels made Office Innovations a Graybar customer. Office Innovations executed a "National Account Agreement" and a credit application. Office Innovations was approved as a national account for Graybar, and was given a Graybar account number. Office Innovations sold Graybar's products on its internet site and had the products shipped directly to Office Innovations's customers. (Doc. 26 at 2.)

In August 1999, Tim Daniels of Graybar and John and Kathy Gadd of Office Innovations began to discuss the possibility of Graybar selling Office Innovations' products to Graybar customers through a joint mailing catalog. Thereafter, Tim Daniels met with Duane Thompson of United Stationers, Office Innovations' largest supplier, to determine if United Stationers could ship directly to Graybar customers under the Graybar name. (Doc. 26 at 2-3.)

On September 17, 1999, the Gadds, Tim Daniels, Kathy Mazzarella of Graybar, and a technical expert from Graybar met at United Stationers' office in St. Louis, Missouri. The idea of Graybar selling Office Innovations' products on the internet was discussed. (Doc. 26 at 3.)

In January 2000, Daniels issued to Office Innovations a letter of intent to formally enter into the venture with Office Innovations. (Doc. 26 at 3, Ex. A.)

On January 5, 2000, Office Innovations signed an engagement letter with GMA Partners, a venture capital firm. GMA was to provide Office

Innovations with advice and capital raising services for the contract with Graybar. GMA required a signed Graybar contract before it could proceed in its engagement. (Doc. 26 at 3.)

A Business Partner Agreement was prepared by Office Innovations, and a draft was forwarded to Tim Daniels. Daniels told Office Innovations that the contract would have to be approved by Graybar's legal department. Daniels sent the proposed contract to Alice Lenhoff in the Graybar legal department for review. (Doc. 26 at 4.)

On March 23, 2000, Daniels visited the office of Office Innovations and brought multiple original copies of the Business Partner Agreement with him. The agreement bore what appeared to be the signature of Richard Offenbacher, the District Vice President of Graybar, but the name "Offenbacher" was misspelled as "Offendacher." Tim Daniels and Kathy Gadd both signed the agreement in front of one another at this meeting. (Doc. 26 at 4, Ex. B.)

Richard Offenbacher claimed he never signed the document, and that the signature was a forgery.[2] (Doc. 26 at 4-5.)

In September 2000, Fred Florjancic became Chief Executive Officer of Office Innovations. Office Innovations began upgrading its infrastructure and workforce, began printing catalogs, and continued its campaign to raise capital for the Graybar partnership. GMA gathered several private investors for Office Innovations, and formed GMA Partners-OI1, LLC to receive the private placement funding. In September 29, 2000, Office Innovations sent a package of product catalogs and a rollout presentation to Graybar's newly promoted CEO, Robert Reynolds. (Doc. 26 at 5-6.)

On October 31, 2000, Dennis DeSousa, Senior Vice President of Graybar, under the instruction of Reynolds, phoned Florjancic and told him he was unaware of any agreement between Graybar and Office Innovations. Florjancic then faxed a copy of the Business Partner Agreement to DeSousa. DeSousa faxed a copy to Offenbacher requesting an explanation. Offenbacher denied signing the document. Graybar

---

[2]Graybar maintains that the signature is a forgery, and that Tim Daniels forged the signature. Federal Insurance does *not* stipulate that the signature is a forgery. (Doc. 26 at 4-5.)

denied it entered into, and refused to perform under, the Business Partner Agreement.[3] (Doc. 26 at 6.)

Office Innovations filed suit against Graybar and Daniels in 2001, in Fulton County, Georgia, Civil Action No. 2001CV46978. Office Innovations asserted claims for 1) breach of contract; 2) fraud; 3) negligent misrepresentation; 4) promissory estoppel; 5) punitive damages; 6) expenses of litigation; 7) joint adventure; and 8) corporate negligence. GMA Partners-OI1, LLC filed suit against Graybar and Daniels in 2002 in Fulton County Superior Court, Civil Action No. 2002CV57785. It asserted claims for 1) fraud in the inducement; 2) negligent misrepresentation; 3) expenses of litigation; and 4) punitive damages. (Doc. 26 at 6-7.)

Both of the underlying litigations settled, with Graybar agreeing to pay Office Innovations $1,775,000.00, and GMA Partners $400,000. Graybar submitted separate claims related to the underlying litigation under its Employee Theft coverage and its Directors & Officers Liability (D & O) coverage issued by Federal Insurance. Graybar claimed $400,000 for the GMA Partners settlement, plus $19,376.47 in defense costs, and $1,775,000 for the settlement with Office Innovations, plus $429,448.77 in defense costs. (Doc. 26 at 7.)

Federal Insurance acknowledged coverage under the D & O policy for all of the GMA Partners claim, which totaled $419,376.47. Federal contended that the D&O coverage was subject to a $1,000,000.00 deductible and thus there was no payment. (Doc. 26 at 7.)

Federal has acknowledged coverage for some, but not all, of the Office Innovations claim. The parties submitted this issue to arbitration, and Graybar was awarded 57 percent of its claim, or $1,256,535.80 (57 percent of $2,204,448.77). This allocation was subject to the balance on the deductible, leaving a net payment of $675,12.27.

### IV. Discussion

The parties have stipulated that the only issue in these motions for summary judgment is whether the loss plaintiff has suffered is a

---

[3]Defendant asserts that, had Graybar performed under the disputed agreement, it would not have suffered an economic loss.

"direct loss" so that it would be covered under the policy. Therefore, the court must interpret the meaning of "direct loss" as it is used in the contract.

The court must first determine what state's law applies in this diversity action. The court will look to the Missouri choice of law rules to determine what substantive rules of decision apply to this contract dispute. Tompkins v. Erie R.R. Co., 304 U.S. 64 (1938). The parties, in the underlying arbitration, stipulated that Missouri law applies to the interpretation of the policy, and still stipulate to this now. (Doc. 29, Ex. C at 5, n.10.) Therefore, this court will apply Missouri law. Bigham v. McCall Service Stations, Inc., 637 S.W.2d 227, 231 (Mo. Ct. App. 1982) (absence stipulation by parties, apply significant relationship test).

"[T]he meaning of an unambiguous contract presents a question of law appropriate for summary judgment." McCormack v. Citibank, N.A., 100 F.3d 532, 538 (8th Cir. 1996). "Conversely, the interpretation of an ambiguous contract presents a question of fact, thereby precluding summary judgment." Id. (quoting Michalski v. Bank of Am. Ariz., 66 F.3d 993, 996 (8th Cir. 1995)). Whether the contract is ambiguous is a question of law, and a contract is not ambiguous just because the parties disagree as to its meaning. Sligo, Inc. v. Nevois, 84 F.3d 1014, 1019 (8th Cir. 2005).

"The primary rule in interpretation of contracts is to ascertain the intent of the parties and give effect to that intent." Farm Bureau Town & Country Ins. of Missouri v. Hilderbrand, 926 S.W.2d 944, 947 (Mo. Ct. App. 1996). "Intent is to be determined from the contract alone and not based on extrinsic or parol evidence unless the contract is ambiguous." Care Center of Kansas City v. Horton, 173 S.W.3d 353, 355 (Mo. Ct. App. 2005). "An ambiguity arises where there is duplicity, indistinctness or uncertainty in the meaning of the words used in the contract[,]" Farm Bureau, 926 S.W.2d at 947, or when the "terms are reasonably open to more than one meaning . . . ." Care Center of Kansas City, 173 S.W.3d at 355.

Defendant argues that the language is not ambiguous, and that case law is clear that "direct loss" does not cover the loss plaintiff suffered, liability to a third-party. Plaintiff argues that the court,

-6-

under Missouri law, must apply a proximate cause analysis to determine whether it suffered a "direct loss," and in doing so, will find that its losses are covered, because the liability to the third-party directly resulted from the criminal conduct of Daniels.

The policy language provides that:

> The Company shall be liable for <u>direct losses</u> of **Money, Securities**, or other property caused by **Theft** or forgery by any **Employee** of any **Insured** acting alone or in collusion with others.

(Doc. 26 at 1; Doc. 1 Ex. A Part 2 at 12, underlining added).

The policy at issue here is a fidelity policy. "Fidelity insurance is a form of insurance in which the insurer undertakes to guaranty the fidelity of an officer, agent, or employee of the insured, or to indemnify the latter for losses caused by dishonesty or a want of fidelity on the part of such a person." RBC Mortgage Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 812 N.E.2d 728, 733 (Ill. App. Ct. 2004) (policy provided coverage for "direct loss" and expressly excluded "indirect losses"); Frontline Processing Corp. v. American Economy Ins. Co., 149 P.3d 906, 909 (Mont. 2006).

Under Missouri law, the courts have consistently applied a proximate cause analysis to determine if a loss was a direct result of an action. In Toumayan v. State Farm General Insurance Co., 970 S.W.2d 822 (Mo. Ct. App. 1998), the court applied a proximate cause analysis when faced with insurance language covering "direct physical loss" by broken sewer lines. Id. at 825. In Toumayan, a broken sewer line cause extensive earth movement, which damaged plaintiffs' property. Id. At 823. The court found that the proximate cause analysis must be used unless the partied expressly contracted out of it. Id. at 826 (parties did contract out of proximate cause application by providing that earth movement was excluded regardless of initial cause of loss).[4] See also Madison Block Pharmacy, Inc. v. United States Fidelity and Guaranty Co.,

---

[4]Defendant asserts that the Toumayan court ultimately rejected the proximate cause analysis because the contract was unambiguous. To this court's understanding, the court in Toumayan rejected a probable cause analysis because the parties clearly contracted out of the proximate cause analysis by clearly excluding the fact situation at hand in that case. Toumayan, 970 S.W.2d at 826. Here, the fact situation as hand is not expressly and clearly excluded from coverage.

620, S.W.2d 343 (Mo. banc. 1981) (applied proximate cause analysis to determine whether something was a "direct" result of covered actions); Cantrell v. Farm Bureau Town & Country Ins. Co. of Missouri, 876 S.W.2d 660, 663 (Mo. Ct. App. 1994) (where ambiguity exists in insurance contract, proximate cause analysis must be applied); Beauty Supplies, Inc. v. Hanover Ins. Co., 526 S.W.2d 75, 76 (Mo. Ct. App. 1975) (whether damage was covered is a question of proximate cause).

Defendant argues that, despite Missouri case law, this court should not apply a proximate cause analysis to these facts because such an analysis is not appropriate for fidelity policies, and that losses such as the ones here are never covered under fidelity policies.

Other jurisdictions have applied a "proximate cause analysis" to determine whether a loss is a "direct loss" under a fidelity policy like the one in the instant case. Scirex Corp. v. Federal Ins. Co., 313 F.3d 841 (3rd. Cir. 2002);[5] Jefferson Bank v. Progressive Casualty Ins., 965 F.2d 1274 (3rd Cir. 1992);[6] Auto Lenders v. Gentilini Ford, Inc., 854 A.2d 378 (N.J. 2004); Frontline, 149 P.3d at 193; Mid-America Bank of Chaska, 745 F. Supp. 1480, 1485 (D. Minn. 1990) (when "direct cause" language is in insurance policy, question is whether the analysis act was a "substantial" cause of the resulting loss). In Auto Lenders, the court found "no sound reason why a proximate-cause analysis should not be employed when determining whether a loss is direct under a fidelity insurance policy." Id. at 387.

Defendant also argues that the losses suffered in this case are not direct losses because they are losses a third-party suffered, which are

---

[5] In Scirex, nurses falsified drug reports in a drug study, leading Scirex to suffer $1.2 million dollars in loss because it had to replicate the study, because the first one was worthless. Scirex, 313 F.3d at 843. The court applied a proximate cause analysis, and determined that the losses due to having to replicate the study were a direct loss from the nurses' dishonest conduct. Id. at 850.

[6] In Jefferson Bank, the court was faced with the issue of whether the loss a bank acquired from a worthless mortgage "directly resulted from" a notary's forged signature. 965 F.2d at 1280. The court found that the term "directly caused" meant that plaintiff must prove the signature was the proximate cause of its loss. Id. The court found that, under Pennsylvania law, courts had defined "direct cause of loss" as "proximate cause of loss." Id. at 1281-82 (question of fact about whether forged signature was proximate cause).

-8-

never covered.  Other jurisdictions have held that losses to third-parties, such as lawsuit settlements stemming from criminal conduct, are not "direct losses" under fidelity policies.  RBC Mortgage, 812 N.E.2d at 733.  In RBC Mortgage, the court found that the employee's conduct merely "set into motion" a chain of events resulting in the loss, but that the settlement was not a "direct loss."  Id. at 735; see also Frontline Processing Corp. v. American Economy Ins. Co., 149 P.3d 906 (Mont. 2006) (in dicta, stated that under proximate cause analysis, "direct loss" includes fees to investigate fraud, but "typically" not third-party liability).  In Tri City National Bank v. Federal Insurance Co., 674 N.W.2d 617 (2003), the court held that third-party settlements were not direct losses, noted it was not holding that all third-party losses are not covered in fidelity policies.  Id. at 623-25.  Under the particular facts of that case, the third-party loss was not direct.  Id. at 626, n.9; see The Vons Cos. v. Federal Ins. Co., 57 F. Supp. 2d 933 (C.D. Cal. 1998) (fidelity policy did not provide coverage for any third party claims).

These cases are not persuasive, because, except for Frontline, those courts did not apply a proximate cause analysis to determine what was a direct loss, as Missouri law requires.  Further, in Frontline, the facts are distinguishable because the court was not faced with third party lawsuit settlements.  149 P.3d at 910.

Given that Missouri courts have a strong history of using the proximate cause analysis to determine if a loss is a "direct loss" and because many other jurisdictions have used the analysis when interpreting the type of policy at issue here, this court concludes that Missouri courts would apply a proximate cause analysis to the facts of this case.  This is supported further by the fact that a Missouri court has held "[d]irect is a synonym of proximate."  John Drennon & Sons Co. v. New Hampshire Ins. Co., 637 S.W.2d 339, 341 (Mo. Ct. App. 1982). "The application of the efficient proximate cause doctrine is appropriate where there is an absence of exclusionary language or where the insurance contract is ambiguous."  Toumayan, 970 S.W.2d at 826. "The question of determining what losses directly and proximately flow from a specified covered peril cannot be reached until it is determined

-9-

whether or not the exclusionary language clearly and unambiguously precludes recovery for such losses." Id.

Here, there is no exclusionary language providing that third-party claims are not covered. Missouri law is clear that when determining whether a loss is a direct result of something, absent clear exclusionary language, use of the proximate cause analysis is appropriate. Toumayan, 970 S.W.2d at 826. The parties here could have contracted for a clear exclusion for third-party liability; they did not do so. So, any losses that are proximately caused by the forgery are covered. Missouri courts have not made an exception for fidelity insurance contracts.

For these reasons,

**IT IS HEREBY ORDERED** that the motion of defendant Federal Insurance Company for summary judgment (Doc. 24) is denied.

**IT IS FURTHER ORDERED** that the motion of plaintiff for partial summary judgment (Doc. 27) is sustained in that the court will apply the proximate cause standard to the facts of this case. However, in all other respects, because the undisputed record does not clearly establish that the alleged losses of plaintiff were proximately caused by the covered conduct of its employee, the motion of plaintiff for partial summary judgment is denied.

                                         /S/   David D. Noce
                                    **DAVID D. NOCE**
                                    **UNITED STATES MAGISTRATE JUDGE**

Signed on May 9, 2007.