```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                           EASTERN DIVISION
```

GRAYBAR ELECTRIC COMPANY, INC., )
                                )
          Plaintiff,            )
                                )
     v.                         )     No. 4:06 CV 1275 DDN
                                )
FEDERAL INSURANCE COMPANY,      )
                                )
          Defendant.            )

### MEMORANDUM

This matter is before the court on the motions for summary judgment of defendant Federal Insurance Company for summary judgment (Doc. 71) and of plaintiff Graybar Electric Company, Inc. (Doc. 73). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 19.) A hearing was held on June 5, 2008.

### I. BACKGROUND

Plaintiff Graybar Electric Company, Inc., (Graybar) brought this action against defendant Federal Insurance Company (Federal). In its complaint, Graybar alleges that Federal breached an insurance contract, Policy No. 8147-74-19, by refusing to pay the entirety of Graybar's losses from the settlement of an underlying lawsuit. (Doc. 1 at ¶ 1.) Count I seeks a declaratory judgment of coverage under the Crime Coverage section of the policy. (Doc. 1 at 8.) Count II seeks damages for breach of contract. (Doc. 1 at 9.) In its answer, Federal denies the allegations. (Doc. 12.)

On May 9, 2007, this court denied the earlier motion of Federal for summary judgment, and granted, in part, the earlier motion of Graybar for summary judgment. (Doc. 40 at 10); Graybar Elec. Co. v. Fed. Ins. Co., No. 4:06 CV 1275 DDN, 2007 WL 1365327, at *7 (E.D. Mo. May 9, 2007). In that order, the court concluded that the proximate cause standard applied to the facts of the case and that this standard would be used to determine whether the loss was a "direct loss" under the Crime Coverage section of the policy. (Doc. 40 at 9-10); Graybar Elec. Co., 2007 WL 1365327, at *6-7.

## II. UNDISPUTED FACTS

A complete review of the record, including the joint stipulation of facts filed by the parties, reveals the following undisputed facts.[1]

Federal Insurance Company issued to Graybar Electric Company, a New York Corporation with its principal place of business in Missouri, an Executive Protection Policy, Policy No. 8147-74-19, effective October 1, 1997, through October 1, 1999, extended by endorsement until October 1, 2003.

Office Innovations is a distributor of office supplies and similar products, and it does some of its business on the Internet. Graybar is a wholesale distributor of electrical and telecommunication products. In May 1999, John Gadd, a representative of Office Innovations, visited the Norcross, Georgia office of Graybar unannounced, and asked to speak with someone about selling Graybar's telephone equipment. He was introduced to Tim Horner, an employee of Graybar. Horner expressed interest, and, after giving Gadd some catalogs, told Gadd that he would have Tim Daniels contact Office Innovations. (Doc. 26 at 1-2.)

Thereafter, Tim Daniels contacted Office Innovations, and, after a meeting at Office Innovations' office, Daniels made Office Innovations a Graybar customer. Office Innovations executed a "National Account Agreement" and a credit application. Office Innovations was approved as a national account for Graybar, and was given a Graybar account number. Office Innovations sold Graybar's products on its Internet site and had the products shipped directly to Office Innovations' customers. (Doc. 26 at 2.)

In August 1999, Tim Daniels of Graybar and John and Kathy Gadd of Office Innovations began to discuss the possibility of Graybar selling Office Innovations' products to Graybar customers through a joint mailing catalog. Thereafter, Tim Daniels met with Duane Thompson of United Stationers, Office Innovations' largest supplier, to determine if United Stationers could ship directly to Graybar customers under the Graybar name. (Doc. 26 at 2-3.)

On September 17, 1999, the Gadds, Tim Daniels, Kathy Mazzarella of Graybar, and a technical expert from Graybar met at United Stationers'

---

[1]The stipulated facts filed by the parties are consistent with the undisputed facts found in the court's opinion of May 9, 2007.

office in St. Louis, Missouri. The idea of Graybar selling Office Innovations' products on the Internet was discussed. (Doc. 26 at 3.)

In January 2000, Daniels issued to Office Innovations a letter of intent to formally enter into the venture with Office Innovations. (Doc. 26 at 3, Ex. A.)

On January 5, 2000, Office Innovations signed an engagement letter with GMA Partners, a venture capital firm. GMA was to provide Office Innovations with advice and capital raising services for the contract with Graybar. GMA required a signed Graybar contract before it could proceed in its engagement. (Doc. 26 at 3.)

A Business Partner Agreement was prepared by Office Innovations, and a draft was forwarded to Tim Daniels. Daniels told Office Innovations that the contract would have to be approved by Graybar's legal department. Daniels sent the proposed contract to Alice Lenhoff in the Graybar legal department for review. (Doc. 26 at 4.)

On March 23, 2000, Daniels visited the office of Office Innovations and brought multiple original copies of the Business Partner Agreement with him. The agreement bore what appeared to be the signature of Richard Offenbacher, the District Vice President of Graybar, but the name "Offenbacher" was misspelled as "Offendacher." Tim Daniels and Kathy Gadd both signed the agreement in front of one another at this meeting. (Doc. 26 at 4, Ex. B.)

Richard Offenbacher later claimed he never signed the document, and that the signature was a forgery. (Doc. 26 at 4-5.) Federal has stipulated that Tim Daniels forged Richard Offenbacher's signature on the Business Partner Agreement. (Doc. 70 at ¶ 20.)

In September 2000, Fred Florjancic became Chief Executive Officer of Office Innovations. Office Innovations began upgrading its infrastructure and workforce, began printing catalogs, and continued its campaign to raise capital for the Graybar partnership. GMA gathered several private investors for Office Innovations, and formed GMA Partners-OI1, LLC to receive the private placement funding. On September 29, 2000, Office Innovations sent a package of product catalogs and a rollout presentation to Graybar's newly promoted CEO, Robert Reynolds. (Doc. 26 at 5-6.)

On October 31, 2000, Dennis DeSousa, Senior Vice President of Graybar, under the instruction of Reynolds, phoned Florjancic and told him he was unaware of any agreement between Graybar and Office Innovations. Florjancic then faxed a copy of the Business Partner Agreement to DeSousa. DeSousa faxed a copy to Offenbacher requesting an explanation. Offenbacher denied signing the document. Graybar denied it entered into, and refused to perform under, the Business Partner Agreement.[2] (Doc. 26 at 6.)

Office Innovations filed suit against Graybar and Daniels in 2001, in Fulton County, Georgia, Civil Action No. 2001 CV 46978. Office Innovations asserted claims for 1) breach of contract; 2) fraud; 3) negligent misrepresentation; 4) promissory estoppel; 5) punitive damages; 6) expenses of litigation; 7) joint adventure; and 8) corporate negligence. GMA Partners-OI1, LLC also filed suit against Graybar and Daniels in 2002, in Fulton County, Georgia, Civil Action No. 2002 CV 57785. GMA Partners asserted claims for 1) fraud in the inducement; 2) negligent misrepresentation; 3) expenses of litigation; and 4) punitive damages. (Doc. 26 at 6-7.)

Both of the underlying litigations settled, with Graybar agreeing to pay Office Innovations $1,775,000, and GMA Partners $400,000. Graybar submitted separate claims related to the underlying litigation under its Crime Coverage and its Directors & Officers Liability (D & O) Coverage issued by Federal. Graybar claimed $400,000 for the GMA Partners settlement, plus $19,376.47 in defense costs, and $1,775,000 for the settlement with Office Innovations, plus $429,448.77 in defense costs.[3] (Doc. 26 at 7.)

Federal acknowledged coverage under the D & O Coverage section for all of the GMA Partners claims, which totaled $419,376.47. Federal acknowledged coverage for some, but not all, of the Office Innovations

---

[2]Federal asserts that, had Graybar performed under the disputed agreement, it would not have suffered an economic loss.

[3]The following chart provides a summary of the relevant figures:

|  | TOTAL | ATTORNEYS' FEES | SETTLEMENT AMOUNT |
|---|---|---|---|
| Office Innovations: | $2,204,448.77 | $429,448.77 | $1,775,000 |
| GMA Partners: | $419,376.47 | $19,376.47 | $400,000 |
| GRAND TOTALS: | $2,623,825.24 |  | $2,175,000 |

claims under the D & O Coverage section.  Federal contended that the D & O Coverage was subject to a $1,000,000 deductible and thus there was no payment.  (Doc. 26 at 7.)  Another coverage section of the policy, the Crime Coverage section, was subject to a $250,000 deductible.  (Doc. 70 at 8.)  On July 13, 2005, Graybar initiated arbitration on the issues relating to coverage under the D & O section.  ( Id. at 7.)

On July 14, 2005, Graybar filed suit against Federal Insurance in this court.  (<u>Graybar Elec. Co. v. Fed. Ins. Co.</u>, No. 4:05 CV 1097 DDN, E.D. Mo. July 14, 2005).  In its complaint, Graybar alleged coverage under both the D & O Coverage section of the insurance policy (Count I), and the Crime Coverage section of the insurance policy (Count II). (Doc. 1 at ¶ 11.)  In Count I, Graybar sought a declaratory judgment that it was entitled to full coverage under the D & O section, and that the deductible did not apply.  (<u>Id.</u> at ¶ 21.)  In Count II, Graybar sought a declaratory judgment that it was entitled to full coverage under the Crime section.  (<u>Id.</u> at ¶ 25.)  In particular, Graybar sought recovery of $2,380,000 under the Crime Coverage section (the total loss of $2,630,000, minus the $250,000 deductible).  ( <u>Id.</u>)

On November 15, 2005, the parties filed a joint stipulation of dismissal without prejudice.  (Doc. 22.)  This was done in order to arbitrate the issues related to coverage under the D & O section.  (Doc. 26 at 8.)

Along with the dismissal, the parties entered a dismissal and tolling agreement.  (Doc. 70, Ex. G.)  Under the agreement, the parties agreed to postpone resolution of the issues related to coverage under the Crime section until the arbitration of the D & O Coverage was completed.  ( <u>Id.</u>)

On February 24, 2006, Judge Thomas Lambros, the arbitrator, issued an award relating to the coverage under the D & O section of the policy. (Doc. 70, Ex. H.)  According to the award, the issue for determination was "what amount of Graybar's OI Costs, to be expressed in a percentage, are covered under the Entity Coverage Endorsement to the D&O Coverage section."  (<u>Id.</u>)  Under the award, Judge Lambros awarded Graybar 57 percent of the Office Innovations claim under the D & O Policy, or $1,256,535.80 (57 percent of the overall total of $2,204,448.77).  This allocation was subject to the balance on the deductible, leaving a net

-5-

payment of $675,912.27 ($419.376.47 from the GMA Partners settlement, plus $1,256.535.80, minus the deductible of $1,000,000). (Doc. 70 at 7.) Graybar has stipulated that a $1,000,000 deductible applied to the D & O Coverage. (Doc. 70 at ¶ 39.)

After the arbitration ruling, Federal paid Graybar the $675,912.27. On August 23, 2006, after receiving this payment, Graybar filed this lawsuit against Federal. In an effort to resolve the lawsuit, Federal has stipulated that Graybar's settlement payments to Office Innovations and GMA Partners were proximately caused by the forgery. Graybar has stipulated that the attorneys' fees associated with the settlements are not covered by the Crime Coverage section of the policy. Graybar has also stipulated that it is not seeking bad faith or exemplary damages. Each party has agreed to bear its own costs, expenses, and attorney fees. Finally, Federal has agreed that it will not assert any defenses based on a theory of failure to timely notify. (Doc. 70 at 9.)

The Executive Liability and Indemnification section (the D & O Coverage) of the insurance policy and its endorsement section contain the following relevant provisions:

> **Insuring Clause 3**
> **Insured Organization Coverage**
> The Company shall pay on behalf of any **Insured Organization** all **Loss** for which it becomes legally obligated to pay on account of any **Claim** first made against the **Insured Organization** during the **Policy Period** or, if exercised, during
> the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted, by any **Insured** before or during the **Policy Period**.
>
> \* \* \*
>
> **Wrongful Act** means:
>
> . . .
>
> (b) For purposes of coverage under Insuring Clause 3, any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted, or allegedly committed or attempted, by any **Insured Person**, individually or otherwise, in his **Insured Capacity**, or any matter claimed against him solely by reason of his serving in such **Insured Capacity**, or any **Insured Organization.**
>
> \* \* \*

**Exclusions Applicable to Insuring Clause 3 Only**
6.1  The Company shall not be liable under Insuring Clause 3 for **Loss** on account of any **Claim** made against an **Insured Organization:**

. . .

> (d)  based upon, arising from, or in consequence of any actual or alleged breach of a written oral contract, agreement, warranty or guarantee if such **Insured Organization Claim** is brought by or on behalf of a

party       to    such    contract,    agreement,    warranty or guarantee.

\*    \*    \*

**<u>Allocation</u>**
12.  If **Loss** covered by this coverage section and **Loss** not covered by this coverage section are incurred, either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both covered and uncovered parties, the **Insureds** and the Company shall allocate such amount between covered **Loss** and uncovered loss based upon the relative legal exposures of such parties to such matters.

If the **Insureds** and the Company agree on an allocation of **Defense Costs**, the Company shall advance on a current basis **Defense Costs** allocated to the covered **Loss.** If the **Insureds** and the Company cannot agree on an allocation:

> (a)  no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

> (b)  the Company shall advance on a current basis **Defense Costs** which the Company believes to be covered under this coverage section until a different

allocation     is negotiated, arbitrated or judicially determined; and

> (c)  the Company, if requested by the **Insureds,** shall submit the dispute to binding arbitration. . . .

(Doc. 70, Ex. A at 20–22.)

The Crime Coverage section of the insurance policy contains the following relevant provisions:

<u>Employee Theft Coverage</u>
<u>Insuring Clause 1</u>
1.  The Company shall be liable for direct losses of **Money, Securities** or other property caused by **Theft** or forgery by

-7-

>     any **Employee** of any **Insured** acting alone or in collusion with others.

(Doc. 70, Ex. A at 50.)

Federal charged Graybar separate premiums for the two coverage sections. (Id. at 10.)

### III.  DISCUSSION

Each of the parties has moved for summary judgment on the damages related to the settlement of the lawsuits brought by Office Innovations and GMA Partners. This case concerns the interplay between arbitrated claims and non-arbitrated claims that arise from the same insurance policy and the same set of facts.

The court has subject matter jurisdiction over the action under 28 U.S.C. § 1332, because of the parties' diversity of citizenship and because the amount in controversy exceeds $75,000. (Doc. 1 at ¶¶ 4-7.) As noted in the court's earlier opinion, the court will apply Missouri law. Graybar Elec. Co., 2007 WL 1365327, at *4.

Federal argues that Graybar's claims are based on contractual and non-contractual grounds. Federal argues that the D & O Coverage section of the policy excludes any claims that are contractual in nature. Federal also argues that the only relevant coverage under the Crime Coverage section of the policy is the forgery of the Business Partner Agreement. As a result, Federal argues that any non-contractual claims, such as negligence or misrepresentation, do not fall within the Crime Coverage section. Under the facts of this case, Federal asserts that there is no overlap between the D & O section and the Crime section of the policy, and that the parties should be bound by the percentages found by the arbitrator. Under these percentages, Federal would be obligated to pay Graybar $513,250 under the Crime Coverage section of the policy (43 percent of $1,775,000, minus the $250,000 deductible). (Docs. 72, 81.)

Graybar argues that it should recover the full amount of its losses, with the exception of its legal fees, under the Crime Coverage section of the policy. As a result, Graybar argues that it is entitled to a judgment of $1,925,000 (the full settlement amount of $2,175,000, minus the $250,000 deductible). Graybar argues that this amount would

not result in a windfall recovery, and that nothing in the policy prevents it from recovering under two different sections of the policy. Graybar argues that the arbitration ruling only applied to the D & O Coverage section, and that the percentages from that ruling do not apply to the Crime Coverage section. (Docs. 75, 80, 82.)

**A. Coverage Under the Crime Section of the Policy**

Collateral estoppel, or issue preclusion, prevents a party from litigating an issue previously decided in an earlier proceeding. Johnson v. Mo. Dep't of Health and Senior Servs., 174 S.W.3d 568, 580 (Mo. Ct. App. 2005). For an issue to be precluded by the doctrine of collateral estoppel: 1) the issue must be identical to an issue decided in an earlier adjudication; 2) the earlier adjudication must have resulted in a judgment on the merits; 3) the party to be estopped must have been a party, or in privity with a party, to the prior action; and 4) the party to be estopped must have had a full and fair opportunity to litigate the issue in the prior adjudication. Id. The party asserting collateral estoppel bears the burden of proving each of these four elements. Cent. Transp., Inc. v. Four Phase Sys., Inc., 936 F.2d 256, 260 (6th Cir. 1991). For purposes of collateral estoppel, an arbitration award may constitute a final judgment on the merits. Omaha Indem. Co. v. Royal Am. Managers, Inc., 755 F. Supp. 1451, 1457 (W.D. Mo. 1991); see also Cooper v. Yellow Freight Sys., Inc., 589 S.W.2d 643, 645 (Mo. Ct. App. 1979) ("Our Supreme Court [has] recognized . . . that a right of action granted by state law may be subject to the estoppel effects of a prior and binding arbitration.").

In this case, Federal and Graybar submitted Count I (the D & O Coverage claim) to arbitration, but postponed resolution of the issues relating to Count II (the Crime Coverage claim). On February 24, 2006, Judge Thomas Lambros issued a written opinion, finding that 57 percent of Graybar's Office Innovation costs could be recovered under the D & O Coverage section. In so doing, Judge Lambros found that 43 percent of the Office Innovations claim was contract related, and the remaining 57 percent of the claim was not contract related. (Doc. 70, Ex. H at 11.) This finding resulted in a final judgment on the merits as to Federal's coverage under the D & O section. See Johnson, 174 S.W.3d at 585 ("[A]

judgment on the merits is one rendered after argument and investigation and when it is determined which party is in the right, as distinguished from a judgment rendered upon some preliminary or technical point. . . ."). Graybar was a party to the arbitration before Judge Lambros, and had a full and fair opportunity to litigate the issue, having filed two comprehensive briefs in the action. (Doc. 70, Ex. I.)

Two related questions emerge from this arbitration decision. The first question is what preclusive effect, if any, the arbitration decision will have on the current federal court proceedings. If important federal interests are at stake, issue preclusion will likely be inappropriate. The second question is whether the issue currently before the court is identical to the issue that was decided in the arbitration. If the issues are not identical, issue preclusion will be inappropriate.

**Issues of Federal Law at Stake**

Where parties have submitted certain state claims to arbitration, but reserved other non-arbitrable federal claims for litigation, the preclusive effect of the arbitration remains unsettled. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 222 (1985). "[I]t is far from certain that arbitration proceedings will have any preclusive effect on the litigation of nonarbitrable federal claims." Id. Where important federal rights and interests are at stake, the federal courts may determine, on their own, what preclusive effect to give an arbitration proceeding. Id. at 223. In other words, the Supreme Court has declined to create a standard which would govern the preclusive relationship between arbitrated state law claims and non-arbitrated federal law claims. Id.; see also Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 n.21 (1974) ("We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case."). In deciding preclusion rules, federal courts must take into account the federal interests worth protecting. Byrd, 470 U.S. at 223.

There are several reasons why arbitration proceedings should not preclude subsequent litigation of federal issues. Alexander, 415 U.S. at 57-58. From a procedural standpoint, the fact-finding process in an

arbitration is different from the fact-finding process in a judicial proceeding.  Id. at 57.  The record in an arbitration proceeding is not as complete as a judicial record.  Id.  The usual rules of evidence do not apply, and other rights and procedures - like discovery, cross-examination, and testimony under oath - are severely limited or unavailable.  Id. at 57-58.  Arbitrators also have no obligation to provide reasons for their award.  Id. at 58.  From a jurisdictional standpoint, an arbitrator's authority is more constrained than a judge's authority.  Barrentine v. Ark.-Best Freight Sys., Inc., 450 U.S. 728, 744 (1981).  The arbitrator is limited to giving effect to the intent of the parties, and is often powerless to grant the aggrieved party a broad range of relief.  Id. at 744-45.

Based on these differences, an arbitration proceeding cannot provide an adequate substitute for a judicial trial of important federal issues, such as a § 1983 claim, a Title VII claim, or a Fair Labor Standards Act claim - even where the arbitration and the judicial proceeding are based on the same set of facts.  McDonald v. City of W. Branch, Mich., 466 U.S. 284, 292 (1984); Barrentine, 450 U.S. at 745-46; Alexander, 415 U.S. at 59.  A plaintiff must be allowed to pursue forcefully both his contractual remedies (under an arbitration clause) and his statutory remedies (under a federal statute).  Alexander, 415 U.S. at 60.  "[N]o inconsistency results from permitting both rights to be enforced in their respectively appropriate forums."  Barrentine, 450 U.S. at 745-46.

In this case, Graybar has not asked the court to interpret or enforce any of its federal constitutional or statutory rights.  Instead, Graybar has invoked the court's diversity jurisdiction to decide its breach of contract claims.  See McDonald, 466 U.S. at 290 ("[A]rbitration is well suited to resolving contractual disputes . . . .").  Since there are no overriding federal issues at stake, collateral estoppel is not necessarily inappropriate.

**Identity of Issues**

For an issue to be precluded by the doctrine of collateral estoppel, the issue before the court must be identical to the issue decided in the earlier adjudication. Johnson, 174 S.W.3d at 580. In this case, the issue before the court is not identical to the issue that was decided in the arbitration.

In his award, Judge Lambros interpreted the D & O Coverage section of the insurance policy. The issue currently before the court relates to the Crime Coverage section of the insurance policy. Each of these sections is subject to a different deductible, contains different limits of liability, and insures against different risks. In addition, the D & O Coverage section contains an exclusion for breach of contract claims. The Crime Coverage section does not contain a similar exclusion. The D & O Coverage section also contains a provision for allocating coverage between the covered and non-covered risks. The Crime Coverage section does not contain a provision for allocating coverage, whether by arbitration or otherwise, between the covered and non-covered risks. Judge Lambros was asked to apply the D & O coverage and allocate the risks of liability between the covered wrongful acts and the excluded breach of contract acts. Not only was Judge Lambros not asked to apply the Crime Coverage section, but an allocation between covered crime risk and breach of contract is not relevant. Finally, Federal charged Graybar separate premiums for each of these coverage sections, just as it would have done had it issued two separate policies. See Cameron Mut. Ins. Co. v. Madden, 533 S.W.2d 538, 546 (Mo. 1976) (noting how the insurer charged separate premiums for separate coverages that had been combined into one policy).

Insurers consolidate separate coverage sections into a single insurance policy for reasons of economy and efficiency. Id. While combining coverage sections saves the insurance company money, it does not reduce the amount of coverage the insurance company provides; the combined coverage sections are treated as if the insurance company had issued them separately. Id. Simply put, different coverage provisions "must be treated separately although incorporated in the same policy." Boro Precison Prods. Corp. v. John Hancock Mut. Life Ins. Co., 223 F. Supp. 584, 588 (E.D.N.Y. 1963). Under Madden, Boro Precision Products, and the language of the policy, it follows that the Crime Coverage

section and the D & O Coverage section act as independent sources of coverage. And when a claim is brought under an outside statute or arises from another independent source - as it does here - "then the claim is not precluded even if there was a previous arbitration." Purkey v. Rubino, No. CV 04-0548-E-MHW, 2006 WL 3497267, at *12 (D. Idaho Dec. 4, 2006). This is true, even if the arbitration and the subsequent lawsuit are based on the same set of facts. Acciavatti v. Prof'l Servs. Group, Inc., 982 F. Supp. 69, 80 (D. Mass. 1997). In Acciavatti, the court found the plaintiff's lawsuit was based on an independent state-law right (the Massachusetts Civil Rights Act) and therefore was not precluded by an earlier arbitration of a different subject matter (breach of the collective bargaining agreement), even though the lawsuit and the arbitration were each based on "similar factual underpinnings." Id. Since each of the coverage sections of Graybar's insurance policy implicates a different set of issues, collateral estoppel is inappropriate.

**Intent of the Parties**

The dismissal and tolling agreement also indicates that collateral estoppel is inappropriate.

Arbitration is a matter of contract between the parties, and acts to resolve those disputes - but only those disputes - that the parties have agreed to submit to arbitration. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). Arbitrators derive their authority to resolve disputes only because the parties have agreed to submit their claims to arbitration. AT & T Techs., Inc. v. Commc'n Workers of Am., 475 U.S. 643, 648-49 (1986). These principles of contract extend to the preclusive effects of an arbitration. See Hybert v. Shearson Lehman / Am. Express Inc., 688 F. Supp. 320, 328 (N.D. Ill. 1988). In other words, "[a]n arbitration cannot preclude claims over which the panel did not have jurisdiction." Id. The "'statement of the claim'" helps determine the arbitrator's jurisdiction. See id.

On November 15, 2005, the parties filed a joint stipulation of dismissal without prejudice. (Doc. 22.) The parties dismissed the case in order to arbitrate the issues related to coverage under the D & O section of the policy. (Doc. 26 at 8.) Along with the dismissal, the

parties entered into a dismissal and tolling agreement.  Under the agreement, the parties noted their intent to resolve the "disputes encompassed in the Arbitration, but postpone for further resolution their disputes encompassed in the litigation . . . ." (Doc. 70, Ex. G.) The issue for the arbitration, as noted in Judge Lambros's award, was "what amount of Graybar's OI Costs, to be expressed in a percentage, are covered under the Entity Coverage Endorsement to the D&O Coverage section." (Doc. 70, Ex. H.)  The arbitration award did not purport to resolve any of the issues related to coverage under the Crime Coverage section - and which had been expressly postponed by the dismissal and tolling agreement.  (See id.)

Looking to the dismissal agreement and Judge Lambros's statement of the issues before him, the court concludes that the parties did not intend for the arbitration award to have a preclusive effect on future litigation of the non-arbitrated claims under the Crime Coverage section.  See G. Richard Shell, Res Judicata and Collateral Estoppel Effects of Commercial Arbitration, 35 UCLA L. Rev. 623, 670 (1988).  "If the parties explicitly agreed to exempt certain claims from the scope of an arbitration agreement, it would be clear that the parties intended no res judicata or collateral estoppel effects upon subsequent litigation of those claims."  Id.  It would make little sense to explicitly bargain for judicial resolution of a claim, but then agree to have this judicial claim precluded by an arbitration award.  Id. Because the parties made such a bargain, collateral estoppel is again inappropriate.

Graybar argues that the arbitration ruling only applied to the D & O Coverage section, and that it should recover the full amount of its losses, minus legal fees, under the Crime Coverage section of the policy.

Under Missouri law, the court may not alter the parties' agreements (the relevant policy provisions, the agreement to dismiss the earlier action without prejudice, the tolling agreement, and their various stipulations regarding the pending motions) through interpretation.  Pepsi MidAmerica v. Harris, 232 S.W.3d 648, 654-55 (Mo. Ct. App. 2007).  In interpreting a contract, the court's central obligation is to "ascertain the intention of the parties and to give effect to that intent."  Id.  To

-14-

determine the intent of the parties, the terms of a contract are read as a whole, and given their plain, ordinary, and usual meaning. Id. To determine the ordinary meaning of a term, a court can look to standard English language dictionaries. Shahan v. Shahan, 988 S.W.2d 529, 535 (Mo. 1999). However, if an insurance policy clearly defines a term, then the policy definition controls the application of the policy provisions. State Farm Mut. Auto Ins. Co. v. Ballmer, 899 S.W.2d 523, 525 (Mo. 1995). Where coverage is in dispute, the insured bears the burden of proving, by substantial evidence, that its claim is covered by the insurance contract. Se. Bakery Feeds, Inc. v. Ranger Ins. Co., 974 S.W.2d 635, 638 (Mo. Ct. App. 1998).

The Crime Coverage section of the policy does not define "forgery." However, the parties have stipulated that Tim Daniels forged Richard Offenbacher's signature on the Business Partner Agreement. (Doc. 70 at ¶ 20.) The parties defined this act as a "forgery," which is consistent with a standard dictionary definition of the word. Compare id., with Black's Law Dictionary 677 (8th ed. 2004) (defining forgery as the "act of fraudulently making a false document or altering a real one to be used as if genuine").

The parties have also stipulated that Graybar's settlement payments to Office Innovations and GMA Partners were proximately caused by the forgery. (Doc. 70 at ¶ 41.) As noted in the court's earlier opinion, the proximate cause standard would be used to determine whether Graybar's loss was a "direct loss" within the meaning of the Crime Coverage section of the policy. (Doc. 40 at 9-10); Graybar Elec. Co., 2007 WL 1365327, at *6-7. Under this standard, "any losses that are proximately caused by the forgery are covered [under the policy]." (Doc. 40 at 10); Graybar Elec. Co., 2007 WL 1365327, at *6. Taken together, Graybar's settlement payments to Office Innovations and GMA Partners are covered by the Crime Coverage section. See also First Fed. Sav. & Loan Assoc. of Beresford, S.D. v. Aetna Ins. Co. of Hartford, Conn., 431 F.2d 267, 270 (8th Cir. 1970) (where the forgery was the proximate cause of the loss, the loss was covered by the insurance policy indemnifying against "'[a]ny loss through forgery [of] . . . any instrument'").

## B. Recovery Under the Crime Coverage Section

Graybar argues that it should recover the full amount of its losses, with the exception of its legal fees, under the Crime Coverage section of the policy. According to Graybar, it is entitled to a judgment of $1,925,000 (the full settlement amount of $2,175,000, minus the $250,000 deductible). (Docs. 75, 80, 82.)

A single event may violate more than one right, and the claimant may assert more than one theory of recovery. Kincaid Enters., Inc. v. Porter, 812 S.W.2d 892, 900 (Mo. Ct. App. 1991). At the same time, the plaintiff may not be made more than whole; the plaintiff may not receive more than one recovery for the same harm. Id. A party may not "be put in a better condition than he would have been had the wrong not been committed." Ozark Air Lines, Inc. v. Valley Oil Co., L.L.C., 239 S.W.3d 140, 147 (Mo. Ct. App. 2007).

As noted above, Graybar's settlement payments to Office Innovations and GMA Partners are covered by the Crime Coverage section of the insurance policy. These settlement payments totaled $2,623,825.24. Federal has already paid Graybar the full amount of its settlement with GMA Partners, $419,376.47. To avoid a double recovery, Graybar is limited to recovering the amount of its uncompensated loss from the Office Innovations settlement. Federal has already paid Graybar $256,535.80 on the Office Innovations claim. Graybar has stipulated that it cannot recover its attorneys' fees, $429,448.77, under the Crime Coverage section. (Doc. 70 at ¶ 43.) Finally, Graybar must bear the $250,000 deductible. Subtracting these three amounts from $2,204,448.77, Graybar's insured loss, on the Office Innovations claim,[4] under the Crime Coverage section, Graybar is entitled to recover the principal amount of $1,268,464.20.

## C. Prejudgment Interest

Graybar argues that it is entitled to prejudgment interest beginning on August 27, 2003, the date Graybar made a demand on Federal for reimbursement. (Docs. 75, 82.) Federal argues that prejudgment

---

[4]See footnote 3, above.

interest should not run until after the arbitration award was entered. In particular, Federal argues that prejudgment interest should begin to run on August 23, 2006, the date Graybar filed this lawsuit. (Doc. 79.)

Under Missouri Revised Statutes § 408.020, prejudgment interest begins to accrue on the date that demand for payment is made. Mo. Rev. Stat. § 408.020; Utica Mut. Ins. Co. v. Bancinsure, Inc., No. 4:06 CV 664, 2007 WL 2860237, at *21 (E.D. Mo. Sept. 25, 2007). A demand for payment must be definite as to both time and amount, and made on the debtor party. Children Int'l v. Ammon Painting Co., 215 S.W.3d 194, 203 (Mo. Ct. App. 2006). In terms of timing, a definite future date on which payment is due, or a demand for immediate payment is required. Id. at 205. In terms of amount, Missouri courts cannot order prejudgment interest unless the claim is fixed and determined, or readily ascertainable by computation. Id. at 203. If there is a legitimate dispute concerning the amount of damages, the claim is not fixed and determined. Id. at 205. "Prejudgment interest is generally not warranted when the debtor is unaware of the amount owed." Id. at 204-05. If the party has not made a demand for prejudgment interest before filing suit, then Missouri law considers the filing itself to constitute a demand. Watters v. Travel Guard Int'l, 136 S.W.3d 100, 111 (Mo. Ct. App. 2004). Missouri courts have allowed prejudgment interest for insurance claims where the parties were unable to agree on the amount due under the policy. Id. at 112. An award of damages that is less than the amount requested does not prevent the court from awarding prejudgment interest on the determined damages. Id.

On July 14, 2005, Graybar filed suit against Federal Insurance in this court, seeking an award of $2,380,000 (the total loss from each settlement minus the $250,000 deductible), and any other relief the court deemed proper. (Doc. 1 at ¶ 25.) Under Missouri law, this was a demand for payment of a specific amount.[5] Compare Watters, 136 S.W.3d at 112 (finding petition demanding "over $600.00" was a liquidated demand and noting that a request for "'such other relief as may be proper'" is a sufficient demand for prejudgment interest), with Transam. Ins. Co. v. Pa. Nat'l Ins. Co., 908 S.W.2d 173, 177 (Mo. Ct. App. 1995)

---

[5]There is nothing in the record that indicates Graybar made a demand for payment before July 14, 2005.

-17-

(finding petition that did not request any specific amount was not a sufficient demand for payment).

On November 15, 2005, Graybar and Federal Insurance filed their joint stipulation of dismissal. The parties dismissed the case in order to proceed to arbitration. The arbitration did not involve the Crime Coverage provision of the policy. On August 23, 2006, Graybar resumed the litigation by filing this lawsuit against Federal. In its prayer for relief, Graybar asked the court to order Federal to pay the amount owed under the Crime Coverage section of the policy, plus pre-judgment and post-judgment interest. (Doc. 1 at ¶ 57.)

Under Watters, Graybar is entitled to pre-judgment interest from the time of its demand for the payment of insurance proceeds, when the first federal judicial action was filed in this court on July 14, 2005 to the issuance of the judgment in this action today, but with pre-judgment interest tolled from November 15, 2005, when the first lawsuit was dismissed without prejudice, until August 23, 2006, when the instant action was commenced. Hereafter, Graybar is entitled to interest on its principal judgment pursuant to 28 U.S.C. § 1961.

### IV. CONCLUSION

For the reasons stated above, the motion of defendant Federal Insurance Company for summary judgment is denied, and the motion of plaintiff Graybar Electric Company, Inc. for summary judgment is granted. Plaintiff Graybar Electric Company is entitled to judgment in the principal amount of $1,268,464.20, with pre-judgment and post-judgment interest as set forth above.

A Judgment Order in accordance with this Memorandum is filed herewith.

                                              /S/   David D. Noce
                                        **UNITED STATES MAGISTRATE JUDGE**

Signed on July 9, 2008.